**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 07-cv-1378-RPM

R. W. BECK,  a Washington Corporation,

      Plaintiff,

v.

E3 CONSULTING, a Colorado LLC,

      Defendant.

_____

**R. W. BECK'S OPPOSITION TO**
**E3 CONSULTING'S MOTION FOR SUMMARY JUDGMENT**

_____

      Plaintiff R. W. Beck ("R. W. Beck"), by and through its undersigned counsel, hereby opposes the Motion for Summary Judgment[1] ("Motion") filed by Defendant E3 Consulting ("E3") on August 22, 2007.  Because there exist genuine issues of material fact with respect to each of the four asserted claims, which will be further developed through discovery that E3 has refused to engage in to date, E3's Motion should be denied.

---

[1] Originally styled its motion as a Motion to Dismiss pursuant to Rule 12(b)(6), the Court converted E3's Motion to one for summary judgment pursuant to its Order dated August 23, 2007.  [Doc. # 9].

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

FACTS ..............................................................................................................................1

LEGAL ARGUMENT .......................................................................................................6

    I.   Standard of Review ..............................................................................................6

    II.  Genuine Issues of Material Fact Exist With Respect To Copyright Infringement. ......6

        A.   At a Minimum, a Genuine Issue of Material Fact Exists Regarding Whether E3 Copied R. W. Beck's Copyrightable Material. ..........7

            1.   E3 Had Access To R. W. Beck's Work. ............................................8

            2.   E3's Windsor Report Is Substantially Similar To Copyrighted Elements Of R. W. Beck's Copyrighted Works. ................................8

                a.   The Black & Veatch Report Is An Improper Basis For Abstraction and Filtration. ......................................................9

                b.   E3's Calculation Of The Percentage Of Copied Material To Its Own Windsor Report Is Irrelevant. ...............................12

    III.  R. W. Beck's Claims For Common Law Unfair Competition And Unjust Enrichment Are Not Preempted By The Copyright Act. ...........................................17

        A.   R. W. Beck's Methodologies, Methods, Language and Associated Goodwill are not Copyrightable Subject Matter. ..........................................19

        B.   R. W. Beck's Rights under State Law Unfair Competition and Unjust Enrichment are not Equivalent to the Exclusive Rights in 17 U.S.C. § 106. .20

    IV.  Genuine Issues Of Material Fact Exist With Respect To R. W. Beck's CCPA Claim. ...........................................................................................................................23

        A.   Elements Required to Prove a Claim Under the CCPA. ...............................23

        B.   A Subset Of The General Public Can Be Considered The "Consuming Public For The Purposes Of The CCPA. .....................................................25

CONCLUSION...................................................................................................................26

# TABLE OF AUTHORITIES

## FEDERAL CASES

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)...................................................6, 7

Autoskill, Inc. v. National Education Support System, 994 F.2d 1476 (10th Cir. 1993) ............................................................................................................................7

Beneficial National Bank v. Anderson, 539 U.S. 1 (2003)...............................................17

Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141 (1989) ...........................20

Celotex Corp. v. Catrett, 477 U.S. 317 (1986)...................................................................6

Conley v. Gibson, 355 U.S. 41 (1957) .............................................................................12

Country Kids 'n City Slicks, Inc. v. Sheen, 77 F.3d 1280 (10th Cir. 1996) ...............7, 8, 9

Dow Jones & Co. v. International Sec. Exch., 451 F.3d 295 (2d Cir. 2006)....................21

Duran v. Clover Club Foods Co., 616 F. Supp. 790 (D. Colo. 1985) ..............................23

Ehat v. Tanner, 780 F.2d 876 (10th Cir. 1985).................................................................18

Equal Employment Opportunity Commission v. Horizon/CMS Healthcare Corp., 220 F.3d 1184 (10th Cir. 2000).........................................................................................6

Feder v. Videotrip Corp., 697 F. Supp. 1165 (D. Colo. 1988) ..................................12, 13

Garrett v. Hewlett Packard Co., 305 F.3d 1210 (10th Cir. 2002) ......................................6

Gates Rubber Co. v. Bando Chemical Industrial, 9 F.3d 823 (10th Cir. 1993)............8, 17

Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 U.S. 539 (1985) ..................12

Home Design Serv., Inc. v. B&B Custom Homes, LLC, 509 F. Supp. 2d 968 (D. Colo. 2007)....................................................................................................................6

Jacobsen v. Deseret Book Co., 287 F.3d 936 (10th Cir. 2002).............................8, 12, 17

La Resolana Architects, P.A. v. Clay Realtors Angel Fire, 416 F.3d 1195 (10th Cir. 2005) ...................................................................................................................7

McRae v. Smith, 968 F. Supp. 559 (D. Colo. 1997) ...............................................7, 8, 17

Netquote, Inc. v. Byrd, 504 F. Supp. 2d 1126 (D. Colo. 2007) ........................................25

Ramirez v. eWork, Inc., No. 06-686, 2007 U.S. Dist. LEXIS 68893 (D. Colo.
     Sept. 18, 2007)............................................................................................24

Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002)......................................................12

University of Colo. Foundation, Inc. v. America Cyanamid, 880 F. Supp. 1387
     (D. Colo. 1995)...........................................................................................20

Wedbush Morgan Sec., Inc. v. Kirkpatrick Pettis Capital Management, Inc., No.
     06-510, 2007 U.S. Dist. LEXIS 14390 (D. Colo. Feb 28, 2007) ...............................26

**STATE CASES**

Cablevision of Breckenridge, Inc. v. Tannhauser Condo. Associate, 649 P.2d
     1093 (Colo. 1982)........................................................................................20

Chicago Board Options Exch., Inc. v. International Sec. Exch., No. 06-C-6852,
     2007 WL. 604984 (N.D. Ill. Feb. 23, 2007).................................................19

Hall v. Walker, 969 P.2d 224 (Colo. 1998) ...............................................................24

Heller v. Lexton-Ancira Real Estate Fund, Ltd., 809 P.2d 1016 (Colo. Ct. App.
     1990), rev'd on other grounds, 826 P.2d 819 (Colo. 1992) (quoting Int'l News
     Serv. v. Assoc. Press, 248 U.S. 215 (1918 ......................................19, 20

Rhino Linings USA, v. Rocky Mtn. Rhino Lining, Inc., 62 P.3d 142 (Colo. 2003)...24, 25

**FEDERAL STATUTES**

17 U.S.C. 102  ...............................................................................................19

17 U.S.C. § 106 ..............................................................................18, 19, 20, 21, 23

17 U.S.C. § 301(a)..........................................................................................18

Fed. R. Civ. P. 8(a)........................................................................................12

Fed. R. Civ. P. 26(f).........................................................................................6

Lanham Act, 17 USC. §§ 101 et seq ..........................................................................1

## INTRODUCTION

E3 does not deny that it uses the format and language that appears in R. W. Beck's Sacramento and Orange Reports ("R. W. Beck's Copyrighted Works") in its own Independent Engineer's Report for Windsor Financing, LLC ("Windsor Report") or that such use unfairly trades on R. W. Beck's practices, methodologies, and goodwill. Nevertheless, although no discovery has taken place, E3 seeks judgment as a matter of law on R. W. Beck's asserted claims of (1) copyright infringement under the Lanham Act, 17 U.S.C. §§ 101 *et seq.*; (2) common law unfair competition; (3) deceptive trade practices under the Colorado Consumer Protection Act; and (4) common law unjust enrichment. For the reasons set forth below, E3's Motion is not supported by undisputed facts, and must be denied.

## FACTS

R. W. Beck began preparation of Independent Engineer's Reports in support of non-recourse project financing on solid waste to energy projects and electrical generation cogeneration projects in 1985. *See* Attachment A, Declaration of Kenneth Marino ("Marino Decl."), at ¶ 6. An important section in all engineering reports in support of financings is the section discussion sensitivity analyses, which demonstrate the impact that different assumptions or future conditions would have on the opinions and analyses of the report. *Id.*

R. W. Beck has included an original standard sensitivity section in all of its consulting engineer reports since at least 1985. *Id.* at ¶¶ 6-9. Likewise, each of R. W. Beck's Engineering Reports from 1985 to 1995 included a "Principal Considerations and Assumptions" statement original to R. W. Beck. *Id.* at ¶ 10. Between 1985-1986 alone, R. W. Beck issued a series of reports containing its original "Principal Considerations and Assumptions" statement: (1) for the SES Claremont Refuse-to-Energy Facility Project ("SES Claremont Report"); (2) for the City of

Chicopee, Massachusetts Electric System Revenue Bonds Project ("Chicopee Report"); and (3) for the Ogden Martin Systems of Alexandria/Arlington Project ("Alexandria Report"). *See id.* at ¶¶ 11-13.  In 1987, R. W. Beck revised its standard report language by direction of William Mayben, Managing Director of Consulting for R. W. Beck.  *Id.* at ¶ 14.  On January 7, 1992, R. W. Beck issued an Independent Engineer's Report for the Delaware Solid Waste Authority ("Delaware Report") using revised standard language under the Mayben memo.  *Id.* at ¶ 15.

R. W. Beck's "Principal Considerations and Assumptions" language as used in the SES Claremont, Chicopee, Alexandria, Delaware, Orange and Sacramento Reports was developed by R. W. Beck prior to the Black & Veatch report for the Carson Ice-Gen Project for the Central Valley Financing Authority, which was not issued until July 29, 1993.  *Id.* at ¶¶ 16-18.

R. W. Beck issued its Independent Engineer's Report for the Sacramento Power Authority Cogeneration Project ("Sacramento Report") on December 14, 1995. Ex. 1.  R. W. Beck issued the Independent Engineer's Report for the Orange Cogeneration Limited Partnership Project ("Orange Report") on March 21, 1997.  Ex. 2.  These two reports were copyrighted on April 1, 1996 and November 3, 1999, respectively.  *See* Ex. 3 and 4.  E3 did not issue its Windsor Report until February 7, 2006.  *See* Motion, Hurd Decl., Ex. A.  A timeline reflecting these events is included below:



Based on this history, and for purposes of E3's Motion, at least the following facts, when viewed in the light most favorable to R. W. Beck, raise genuine issues of material fact that preclude summary judgment:

1.      R. W. Beck began use of the copyrighted "Sensitivity" and "Principal Considerations and Assumptions" language in the Orange and Sacramento Reports ("Copyrighted Works") and E3's Windsor Report prior to the Black & Veatch Report and prior to E3's incorporation.  *See* Marino Decl. at ¶ 17; Attachment B, Declaration of E. Michael Gaines ("Gaines Decl.") at ¶¶ 10-16.

2.      As an employee of R. W. Beck from 1985–1997, Paul Plath, was trained in the methodologies, methods, and practices of R. W. Beck.  *See* Marino Decl. at ¶ 25.

3.      Mr. Plath had access to R. W. Beck's Copyrighted Works.  *See id.*

4.      At R. W. Beck, Mr. Plath was not permitted to adopt the format and content of the Black & Veatch Report.  *See id*; *see also* Gaines Decl. at ¶ 24.

5.      Mr. Plath took a position at E3 Consulting and has served as a Senior Vice President since 1999.  *See* Motion, Ex. B, Declaration of Paul B. Plath ("Plath Decl."), at ¶ 2.

3

6.     There is substantial similarity between the non-factual expression in the R. W. Beck Reports and the E3 Windsor Report.  *See* Marino Decl. at ¶ 20 (comparing expression).

7.     The non-fact specific material in the R. W. Beck Reports is qualitatively important and constitutes original expression.  *See id.*

8.     R. W. Beck's "Consulting Engineer's Role in the Preparation of Municipal Official Statement" (the "1982 Manual") and Standards of the Practice ("SOP") mandate language contained in its Copyrighted Works and the E3 Windsor Report.  *See* Gaines Decl. at ¶¶ 5-9, 14-16-20.

9 .     The structure and non-factual expression of the R. W. Beck Copyrighted Works and the E3 Windsor Report are substantially similar.  *See* Marino Decl. at ¶ 20 (comparing reports).

10.     R.W. Beck's SES Claremont, Chicopee, Alexandria and Delaware Reports contain a "Principal Considerations and Assumptions" Section with language similar to the "Principal Considerations and Assumptions" language in the Orange and Sacramento Reports. *See id.* at ¶ 18.

11.     R.W. Beck's SES Claremont, Chicopee, Alexandria and Delaware Reports predate the Black & Veatch Report.  *See id.* at ¶ 17.

12.     R.W. Beck's SES Claremont, Chicopee, Alexandria and Delaware Reports, along with R. W. Beck's 1982 Manual) and R. W. Beck's SOP are the original source for much of the copyrighted language contained in R. W. Beck's Orange and Sacramento Reports.  *See id* at ¶¶ 17-18; Gaines Decl. at ¶¶ 14, 17, 22.

13.     The methodologies, methods, and language in the R. W. Beck Reports are original, proprietary and unique to R. W. Beck, as R. W. Beck carefully developed this language

in consultation with experts in the municipal financing industry, and reflected a unique approach to these issues which differentiated R. W. Beck from competitors. *See* Gaines Decl. at ¶¶ 6, 10.

14.     The Manual and SOP reflect the practices, methodologies, and language used by R. W. Beck in its consulting business, and consequently R. W. Beck has established goodwill in the industry by providing comprehensive, high caliber Independent Engineering Reports. *See id*. at ¶¶ 10, 12, 22.

15.     Because R. W. Beck believes strongly that its methodologies differ from that of its competitors, and the format and language of its reports reflect the distinctiveness of practice, R. W. Beck requires that any significant variations from the approved format requires the approval of R. W. Beck's Managing Director of Consulting Services. *See id*. at ¶¶ 14, 17, 23.

16.     E3 has used R. W. Beck's methodologies, methods, and language from R. W. Beck. *See* Motion, Plath Decl. at ¶¶ 8-9, 11-12.

17.     R. W. Beck and E3 advertise to and solicit business from lenders, equity owners, project owners and others in the energy industry both within the State of Colorado and beyond who seek to raise capital through the sale of bonds or obtain financing through the use of loans. R. W. Beck and E3 distribute their Reports to a wide variety of client qualified institutional buyers, lenders or project participants. Many of the institution buyers, lenders or project participants are located in Colorado. *See* Marino Decl. at ¶ 22.

Based on the presence of these facts, E3 is not entitled to judgment as a matter of law, and E3's Motion for Summary Judgment must be denied.

**LEGAL ARGUMENT**

**I.      Standard of Review**

The plain language of Rule 56(c) only allows the entry of summary judgment, after

adequate time for discovery, where there is no genuine dispute as to any issue of material fact

and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986). The moving party always bears the initial burden of showing that no

genuine issue of material fact exists, and that it is entitled to judgment as a matter of law. *See*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" if, under the governing

law, it could have an effect on the outcome of the lawsuit, and a dispute is "genuine" if a rational

jury could find in favor of the non-moving party on the evidence presented. *See Home Design*

*Serv., Inc. v. B&B Custom Homes, LLC*, 509 F. Supp. 2d 968, 970 (D. Colo. 2007) (citing *Equal*

*Employment Opportunity Comm'n v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th

Cir. 2000)). When considering a motion for summary judgment, the Court views all evidence in

the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255; *Garrett v.*

*Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

**II.     Genuine Issues of Material Fact Exist With Respect To Copyright Infringement.**

Putting aside the issue of adequate discovery,[2] genuine issues of material fact exist at this

time with respect to R. W. Beck's claim for copyright infringement. A copyright exists the

---

[2]      R. W. Beck believes this Motion should be denied based on the fact that R. W. Beck has
not had *any* opportunity (let alone adequate time) for discovery. When R. W. Beck requested a
conference pursuant to Fed. R. Civ. P. 26(f) with E3 so that discovery could commence, E3
refused. *See* Exhibit 12, attached hereto. In addition, by Order dated November 9, 2007, this
Court denied R. W. Beck's Rule 56(f) Motion to deny Defendant's Motion for Summary
Judgment, Or To Hold Defendant's Motion For Summary Judgment In Abeyance until after R.
W. Beck was able to conduct discovery on the relevant issues. [Doc. # 14]. R. W. Beck
respectfully maintains that it has not had adequate time for discovery and therefore, believes that
this Motion should be denied on those grounds alone.

moment an original idea leaves the mind and finds expression in a tangible medium, be it words on a page, images on a screen or paint on a canvas.  *See La Resolana Architects, P.A. v. Clay Realtors Angel Fire*, 416 F.3d 1195, 1199 (10th Cir. 2005).  As acknowledged by E3, in order enforce that copyright, a plaintiff must demonstrate: (1) ownership of a valid copyright; and (2) copying by the defendant of copyrightable material.  *See Country Kids 'n City Slicks, Inc. v. Sheen*, 77 F.3d 1280, 1284 (10th Cir. 1996).  The issue of whether the copyright is valid is a mixed question of law and fact, while the question of whether the defendant copied plaintiff's work is a question of fact.  *Id.*   There is no issue for the purposes of this Motion that Beck's copyrights are valid because E3 "does not dispute that portions of RW Beck's Sacramento and Orange Reports may contain copyrightable subject matter." *See* Motion, at 4, 8 n.5. Accordingly, the only issue before this Court is a factual one, *i.e.*, whether E3 copied protectable elements of R. W. Beck's copyrighted material.

### A.    At a Minimum, a Genuine Issue of Material Fact Exists Regarding Whether E3 Copied R. W. Beck's Copyrightable Material.

A plaintiff may prove defendant's copying either through direct evidence or by showing that (1) defendant had access to plaintiff's copyrighted material and (2) defendant's work is substantially similar to plaintiff's copyrighted material.[3]  *See McRae v. Smith*, 968 F. Supp. 559, 561 (D. Colo. 1997) (citations omitted).  With respect to direct evidence of copying, R. W. Beck has not yet had the opportunity to take any discovery, such as interrogatories, document requests, or a deposition of former R. W. Beck employees who now work for E3, including Mr. Plath, E3's Senior Vice President who was intimately involved in developing R. W. Beck's Sacramento Report, to ascertain whether such evidence can be uncovered.

---

[3]  These two types of circumstantial evidence of infringement are accepted because direct evidence of copying is rarely available.  *See Autoskill, Inc. v. Nat'l Educ. Support Sys.*, 994 F.2d 1476, 1489 (10th Cir. 1993).

1.     <u>E3 Had Access To R. W. Beck's Work</u>.

There is no dispute that E3 had access to R. W. Beck's Copyrighted Works.  Mr. Plath

was employed as an engineer at Beck from 1985–97.  *See* Motion, Plath Decl. ¶¶ 5, 10.  In his

capacity as engineer, Mr. Plath routinely worked Independent Engineer's Reports and other

similar reports that utilized the copyrighted material.  *See id.* at ¶¶ 8-9.  Indeed, Mr. Plath admits

that he was the primary author of Sacramento Report at issue, and the copyright identified in the

Complaint that corresponds to the Sacramento Report bears Mr. Plath's name.  *See* Motion, at 5;

Plath Decl., ¶ 9.  The attachment of materials to Mr. Plath's Declaration, including an

Independent Engineer's Report from Black & Veatch that he purportedly received during a

project while employed by R. W. Beck and the full Independent Engineer's Report referred to as

R. W. Beck's Orange Report demonstrates that Mr. Plath not only had access to R. W. Beck's

copyrighted materials while employed there, but continues to have access at E3 to such material.

*See* Motion, Plath Decl., Exs. A-B.  There can be no plausible argument contradicting the fact –

and E3 makes none – that E3 had access to R. W. Beck's copyrighted materials.

2.     <u>E3's Windsor Report Is Substantially Similar To Copyrighted Elements
       Of R. W. Beck's Copyrighted Works</u>.

Where there is strong proof of access, the necessary showing of factual similarity is

relatively lower.  *Gates Rubber Co. v. Bando Chem. Indus.*, 9 F.3d 823, 833 n.9 (10th Cir. 1993);

*McRae*, 968 F. Supp. at 562.  The traditional test for substantial similarity is whether the accused

work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that

the defendant unlawfully appropriated the plaintiff's protectable expression by taking material of

substance and value.  *Country Kids*, 77 F.3d at 1288.  As the Tenth Circuit has observed, no easy

rule of thumb can be stated with respect to the analysis for "substantial similarity."  *See Jacobsen

v. Deseret Book Co.*, 287 F.3d 936, 943 (10th Cir. 2002).  The inquiry is a qualitative analysis,

rather than a purely quantitative analysis and must be performed on a case-by-case basis.  *See id.*

E3 concedes that some of the words in its own report are "the same," *i.e.*, identical, to those

found in R. W. Beck's Copyrighted Works, but attempts to sidestep this concession through

faulty application of the abstraction-filtration-comparison test.  *See* Motion, at 9.

> a.      *The Black & Veatch Report Is An Improper Basis For Abstraction*
> *and Filtration.*

The Tenth Circuit generally applies the abstraction-filtration-comparison test in copyright

cases to determine substantial similarity.  *See Country Kids*, 77 F.3d at 1284-85.  Abstraction

requires the separation of unprotectable ideas from protectable expressions.  *Id.* at 1285.  After

separation, all of the unprotectable ideas are filtered out.  *Id.*  Finally, the remaining protected

elements are compared to defendant's work to determine if there is substantial similarity.  *Id.*  E3

argues that an Independent Engineer's Report from third-party Black & Veatch predates R. W.

Beck's copyrighted work, and as a result, any words appearing in the Black & Veatch Report are

not original and should be abstracted and filtered out of R. W. Beck material.  *See* Motion, at 9.

First, the Black & Veatch Report does not predate R. W. Beck's use of its protected

language.  The date of the Black & Veatch Report is July 23, 1993.  *See* Motion, Plath Decl., Ex.

A.  R. W. Beck began preparation of Independent Engineer's Reports in support of non-recourse

project financing on solid waste to energy projects and electrical generation cogeneration

projects in approximately 1985.  *See* Marino Decl. at ¶ 6.  In its manual entitled "The Consulting

Engineer's Role in the Preparation of Municipal Official Statements" issued in September 1982,

R. W. Beck provided the following copyrighted language with respect to the Principal

Considerations and Assumptions:

> In the preparation of this report and the opinions that follow, we have made
> certain assumptions with respect to conditions which may occur in the future.
> While we believe these assumptions are reasonable for the purpose of this report,

> they are dependent upon future events and actual conditions may differ from those assumed. In addition, we have used and relied upon certain information provided to us by others. While we believe the sources to be reliable, we have not independently verified the information and offer no assurances with respect thereto. To the extent that actual future conditions differ from those assumed herein or provided to us by others, the actual results will vary from those forecast.

*See* Gaines Decl. at ¶ 9; Ex. 10 at 24. It incorporated almost identical language into its report for the Delaware Solid Waste Authority's Waste System Project ("Delaware Report"). *See* Marino Decl. at ¶ 15; Ex. 5 at A-42. Almost eleven years after the issuance of the 1982 Manual, Black & Veatch utilized language almost identical to that set forth in the 1982 Manual and its Delaware Report (both of which indisputably predate the Black & Veatch Report):

| 1982 Manual | January 7, 1992 Delaware Report | July 29, 1993 Black & Veatch Report |
|---|---|---|
| *In the preparation of this report and the opinions that follow, we have made certain assumptions with respect to conditions which may occur in the future. While we believe these assumptions are reasonable for the purpose of this report,* they are dependent upon future events and actual conditions may differ from those assumed. In addition, *we have used and relied upon certain information provided to us by others.* While we believe the sources to be reliable, we have not independently verified the information and offer no assurances with respect thereto. *To the extent that actual future conditions differ from those assumed herein or provided to us by others, the actual results will vary from those forecast . . .* | *In the preparation of this Report and the opinions that follow, we have made certain assumptions with respect to conditions which may exist or events which may occur in the future. While we believe these assumptions to be reasonable for the purpose of this Report,* they are dependent upon future events, and actual conditions may differ from those assumed. In addition, *we have used and relied upon certain information provided to us by sources* which we believe to be reliable. *We believe the use of such information and assumptions is reasonable for the purpose of our Report.* However, some assumptions may vary significantly due to unanticipated events and circumstances. *To the extent that actual future conditions differ from those assumed herein or provided to us by* | *Black & Veatch has used and relied upon certain information provided by the Owner, the Developer, SMUD, and others* in this assessment of the Project. *We believe the information* provided is true and correct, and *reasonable for the purposes of this Report. In preparing this Report and the opinions presented herein, Black & Veatch has made certain assumptions with respect to conditions which may exist, or events which may occur in the future. We believe that the use of this information and assumptions is reasonable for purpose of this Report.* However, some events may occur or circumstances change, which cannot be foreseen or controlled by Black & Veatch, and which may render our assumptions incorrect. *To the extent that actual future conditions differ from those* |

| | | |
|---|---|---|
| | *others, the actual results will vary from those forecast. This Report summarizes our work up to the date of the Report.* Thus, changed conditions occurring or becoming known after such date could affect the material presented to the extent of such changes. | *assumed herein or provided to Black & Veatch by others, the actual results vary from those which have been forecast* in this Report. *This Report summarizes Black & Veatch's assessment of the Project as of the date of this Report.* |

*Compare* Ex. 10 at 16 and Ex. 5 at A-42 *with* Plath Decl., Ex. A, at 2. The R. W. Beck Orange and Sacramento Reports are two examples of copyrighted works that derive from the Manual and several prior R. W. Beck reports. *See* Marino Decl. at ¶¶ 17-18.

Furthermore, Mr. Marino, who worked with Mr. Plath on the SMUD Project disputes the allegation that a Goldman Sachs representative (who is unidentified in Mr. Plath's Declaration and whose identity R. W. Beck has not had an opportunity to ascertain through discovery) directed Mr. Plath to follow the format and content of the Black & Veatch Report. *See* Marino Decl. at ¶ 24. In addition, it is against the Manual and the SOP of R. W. Beck for engineers to deviate from the standard language, including that used in the sections entitled "Principal Considerations and Assumptions Used in the Projection of Operating Results" and "Conclusions" as well as the manner in which the reports are signed, without prior approval. *See* Gaines Decl. at ¶¶ 17, 22. All variations from the standard language as set forth in R. W. Beck's SOP require review by a Qualified Reviewer. *See id.* at ¶ 17. As a result, Mr. Plath was not, and would not have been permitted to adopt the format and content of the Black & Veatch Report as asserted in his Declaration. *Id.* at ¶ 24; Marino Decl. at ¶¶ 24-25.

Based on these facts and the procedural posture of the case, it would be improper for the Court to conclude as a matter of law that the words found in the Black & Veatch Report should be abstracted and filtered out of the R. W. Beck material.

11

        b.        *E3's Calculation Of The Percentage Of Copied Material To Its Own Windsor Report Is Irrelevant.*

E3's also asserts that there is no substantial similarity between its Windsor Report and Beck's Orange Report because less than 10% of the words are identical, and such words amount to 1% of its entire Windsor Report. *See* Motion, at 9. These arguments simply miss the point for multiple reasons. First, E3 only analyzed the excerpts attached to the Complaint for copyrighted material, rather than the reports as a whole.[4] Once the entire bodies of the R. W. Beck Reports and SOP are analyzed, it is clear that given the specific factual nature of these reports, E3's report contains a significant portion of the non-factual expression. Second, even assuming for the purposes of argument that E3's calculations are correct (which they are not), they are irrelevant. Copying cannot be excused because it is insubstantial as compared to the *infringing* work. *See Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 565 (1985) (citing Judge Learned Hand's remark that "no plagiarist can excuse the wrong by showing how much of his work he did not pirate"). The salient question is whether the similarity relates to matter that constitutes a substantial portion of R. W. Beck's work – not whether such material constitutes a substantial portion of E3's work. *See Jacobsen*, 287 F.3d at 945. Third, even if a copied portion is relatively small in proportion to the entire work, if it is qualitatively important, the finder of fact may properly find substantial similarity. *See Feder v. Videotrip Corp.*, 697 F. Supp. 1165, 1176 (D. Colo. 1988) (citations omitted). E3 chose to copy a substantial portion of the non-fact specific material in the R. W. Beck Reports, and such material is qualitatively important as it

---

[4] Under the notice pleading requirements of Fed. R. Civ. P. 8(a), R. W. Beck was not required to set forth each and every allegation of copying in its Complaint. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002) (quoting *Conley v. Gibson*, 355 U.S. 41, 48 (1957) (federal pleading is not a "game of skill" and a complaint should not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of relief)). Rather, R. W. Beck satisfied Rule 8(a) by pleading a short and plain statement of the claim showing that it was entitled to relief. Fed. R. Civ. P. 8(a).

derives from years of developing the best methods for communicating technical engineering principles to a non-technical audience. *See* Gaines Decl. at ¶ 10. Fourth, a finding of substantial similarity does not require the work to be a "virtual copy" of the protected work. *See Country Kids*, 77 F.3d at 1288. Rather, two types of similarity may be proven: (1) fragmented literal similarity, where portions of the copyrighted work are literally duplicated and (2) comprehensive non-literal similarity, where the fundamental essence or structure of one work is duplicated in another. *See Feder*, 697 F. Supp. at 1172. Both exist in this case.

 ***Fragmented Literal Similarity.***  The appropriate comparison in this case is to compare the literal language of the E3 Windsor Report to the R. W. Beck Reports, without abstraction or filtration from the Black & Veatch Report. Several substantive fragments of the R. W. Beck Reports are identical or substantially similar to E3's report. For example, the E3 Windsor Report uses the *identical* description and introductory sentences to describe its preparation of the respective reports and opinions:

| R. W. Beck Copyrighted Works | E3 Windsor Report |
|---|---|
| *Principal Considerations and Assumptions Used in the Projection of Operating Results See* Motion, Plath Decl., Ex. B. at 33; *see also* Marino Decl., Ex. 1 at B-41, Ex. 2 at 33. | *Principal Considerations and Assumptions Used in the Projection of Operating Results See* Motion, Hurd Decl., Ex. A at 55. |
| *In the preparation of this Report and the opinions that follow, we have made certain assumptions with respect to conditions which may exist or events which may occur in the future. While we believe these assumptions to be reasonable for the purpose of this Report, they are dependent upon future events, and actual conditions may differ from those assumed. In addition, we have used and relied upon certain information provided to us by sources which we believe to be reliable. See* Motion, Plath Decl., Ex. B. 33; *see also* Marino Decl., Ex. 1 at B-41, Ex. 2 at 33. | *In the preparation of this Report and the opinions that follow, we have made certain assumptions with respect to conditions which may exist or events which may occur in the future. While we believe these assumptions to be reasonable for the purpose of this Report, they are dependent upon future events, and actual conditions may differ from those assumed. In addition, we have used and relied upon certain information provided to us by sources which we believe to be reliable. See* Motion, Hurd Decl., Ex. A at 55. |

| | |
|---|---|
| *To the extent that actual future conditions differ from those assumed herein or provided to us by others, the actual results will vary from those forecast. See* Motion, Plath Decl., Ex. B. at 33; *see also* Marino Decl., Ex. 1 at B-41; Ex. 2 at 33. | *To the extent that actual future conditions differ from those assumed herein or provided to us by others, the actual results will vary from those forecast. See* Motion, Hurd Decl., Ex. A at 55. |

In fact, this language is set forth in the R. W. Beck SOP,[5] *see* Ex. 11 at VI-5; *id.* at VI-6, and is

substantially similar to the language provided in the 1982 Manual, *see* Ex. 10 at 24; *see also*

Gaines Decl., at ¶ 15.

Even the language in the Reports that is not identical is substantially the same:

| **R. W. Beck Copyrighted Works** | **E3 Windsor Report** |
|---|---|
| As Independent Engineer, *we have made no determination as to the validity and enforceability of* the Project *Agreements;* however, for the purposes of this Report, we *have assumed* the Project Agreements will be *fully enforceable* in accordance with their terms *and that all parties will comply* with the provisions of their respective *agreements. See* Motion, Plath Decl., Ex. B at 4; *see* Marino Decl., Ex. 1 at B-41, Ex. 2 at B-31. | *We have made no determination as to the validity or enforceability of* these *agreements* and *have assumed that they are fully enforceable and that all parties will comply with* their contractual obligations *under the agreements. See* Motion, Hurd Decl., Ex. A at 8. |
| *Due to the uncertainties* necessarily *inherent in relying on assumptions and projections, it should be anticipated that certain circumstances and events may differ from those assumed and described herein and that such circumstances may affect the results of our Base Case* Projected Operating Results. *See* Motion, Plath Decl., Ex. B at 32; *see also* Marino Decl., Ex. 1 at B-39, Ex. 2 at B-30. | *Due to the uncertainties inherent in relying upon assumptions and projections, it should be anticipated that certain circumstances and events may differ from those assumed and described herein and that such uncertainties will affect the results of the base case* financial projections. *See* Motion, Hurd Decl., Ex. A at 51. |
| In order *to demonstrate the impact of certain circumstances on the Base Case* Projected Operating Results, a number of *sensitivity analyses were developed.* It should be noted that other examples could have been | *To demonstrate the impact of variances* in key performance and cost assumptions used in the base case financial projections, certain *sensitivity cases were developed.* The sensitivity cases which we *selected are not* |

---

[5] Later, before E3 issued its Windsor Report, R. W. Beck issued an SOP in June 24, 1994 and it updated June 6, 1997 that directs its engineers on the standard form and language to use in reports.

| | |
|---|---|
| considered and those presented *are not intended to reflect the full extent possible impacts on the Project. The sensitivities are not presented in any particular order with regard to the likelihood of any case actually occurring. In addition, no assurance can be given that all relevant sensitivities have been presented, that the level of each sensitivity is the appropriate level for testing purposes, or that one (rather than a combination of more* than one) *such variations or sensitivities could impact the Project in the future. See* Motion, Plath Decl., Ex. B at 32; *see also* Marino Decl., Ex. 1 at B-39, Ex. 2 at B-30. | *intended to reflect the full extent of all relevant or possible impacts to the Project. The sensitivities are not presented in any particular order with regard to the likelihood of any case actually occurring. In addition, no assurance can be given that all relevant sensitivity cases have been presented, that the level of each sensitivity is the appropriate level for testing purposes, or that only one (rather than a combination of several) such variations or sensitivities could impact the Project in the future. See* Motion, Hurd Decl., Ex. A at 51. |
| However, some assumptions *may vary* significantly *due to unanticipated events and circumstances.* <br> *See* Motion, Plath Decl., Ex. B. 33; *see also* Marino Decl., Ex. 1 at B-41; Ex. -2 at B-31. | We believe the use of such information and assumptions is reasonable for the purposes of this Report; however, actual conditions *may vary due to unanticipated events and circumstances. See* Motion, Hurd Decl., Ex. A at 55. |
| *This Report summarizes our work up to the date of the Report. Thus, changed conditions occurring or becoming known after such date could affect the material presented to the extent of such changes. See* Motion, Plath Decl., Ex. B. 33; *see also* Marino Decl., Ex. 1 at B-41; Ex. 2 at B-31. | *This Report summarizes the result of our work through the date of this Report, thus, changed conditions occurring or becoming known after such date could affect the material and projections presented. See* Motion, Hurd Decl., Ex. A at 55. |
| *As Independent Engineer, we have made no determination as to the validity and enforceability of any contract, agreement, rule or regulation applicable to the Project or its operations. However, for the purposes of this Report, we have assumed that all such contracts, agreements, rules and regulations will be fully enforceable in accordance with their terms and that all parties will comply with the provisions of their respective agreements. See* Motion, Plath Decl., *see also* Marino Decl., Ex. 1 at B-41; Ex. 2 at B-31. | *As Independent Engineer, we have made no determination as to the validity and enforceability of any contract, agreement, rule or regulation applicable to the Project or its operations. However, for the purposes of this Report, we have assumed that all such contracts, agreements, rules and regulations will be fully enforceable in accordance with their terms.* Moreover, it is *assumed that all parties will comply with and fulfill the terms of their respective* contracts *and agreements. See* Motion, Hurd Decl., Ex. A at 55. |

Again, much of this language is reflected in R. W. Beck's SOP.[6] *See, e.g.,* Ex. 10 at VI-4-5. At a minimum, a fact issue exists as to whether the instances of fragmented literal similarity that are scattered throughout the E3 Windsor Report amount to substantial similarity.  E3's Motion should be denied.

   ***Comprehensive Non-Literal Similarity.***  A comparison of the format of the E3 Windsor Report and R. W. Beck's copyrighted Orange Report also demonstrates that there is substantial similarity between the two.  First, as demonstrated by the juxtaposition of the respective Tables of Contents, E3 has substantially duplicated the order and form of the R. W. Beck Report.  Both start with the Project Participants, then move on to a section regarding the Project, including subsections describing the project site(s), a review of the technology available, estimated useful life of the project, then discuss Projected Operating Results, Principal Considerations and Assumptions Used in the Projection of Operating Results, and end with Conclusions.  *Compare* Plath Decl., Ex. A at 2-3 *with* Plath Decl., Ex. B at 2.  Indeed, even the respective copyright notices are placed in the same location on both reports.  *Compare* Hurd Decl., Ex. A at 3 *with* Plath Decl., Ex. B at 2.  Second, the "Principal Assumptions and Considerations" section immediately precedes the "Conclusions" section of the three reports, and the conclusions are the last section of the reports, in accordance with the SOP requirements of R. W. Beck.  *See* Hurd Decl., Ex. A at 55-58; Plath Decl., Ex. B at 33-35; Gaines Decl., at ¶¶ 16-17; *see also* Ex. 11 at § VII-2.  Third, despite E3's conclusory argument to the contrary set forth in a footnote, Motion at 9 n.8, the purpose of the report does not dictate the form.  For example, nothing requires the assumptions and considerations to immediately precede the conclusions, rather than having such assumptions and considerations appear earlier in a report.  Likewise, nothing requires the

---

[6] Indeed, some of this language dates back to at least 1985, as it appeared in R. W. Beck's SES Clermont Report. *See* Ex. 6 at A-35-A-36.

conclusions to be only cited at the end of the report, rather than at the beginning of the report so that the reader is informed of the conclusions without reading the remainder of the report.

In *Jacobsen*, the Tenth Circuit found that whether works are substantially similar is a "classic jury question." *See Jacobsen*, 287 F.3d at 943. To that end, this Court has noted that "substantial similarity is usually an extremely close issue of fact and summary judgment has been disfavored in cases involving intellectual property." *See McRae*, 968 F. Supp. at 561. Summary judgment is only appropriate when reasonable minds cannot differ as to the absence of substantial similarity in expression. *Id.* E3 has not established undisputed facts demonstrating that reasonable minds could not differ as to the absence of substantial similarity between E3's Windsor Report and R. W. Beck's Copyrighted Works. E3's Motion must be denied.

## III. R. W. Beck's Claims For Common Law Unfair Competition And Unjust Enrichment Are Not Preempted By The Copyright Act.

E3 asserts that R. W. Beck's state law claims for unfair competition and unjust enrichment are preempted by the Copyright Act. *See* Motion, at 10-11. E3's argument that "the Tenth Circuit has held that unfair competition and unjust enrichment claims are equivalent to a federal copyright infringement claim and pre-empted by federal copyright law," *see id.*, is a gross oversimplification of the preemption analysis required by the Copyright Act. Upon closer consideration, R. W. Beck's unfair competition and unjust enrichment claims reveal that they are not based on E3's violation of the exclusive rights granted to R. W. Beck under the Copyright Act, and are instead based on E3's unauthorized *use* of R. W. Beck's "methodologies, methods, and language" in creating its reports. Accordingly, there is no preemption.

A state law claim is preempted by federal law if federal law "provides the exclusive cause of action." *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6 (2003); *Gates Rubber Co. v. Bando Chem. Indus.*, 9 F.3d 823, 847-48 (10th Cir. 1993) ("Federal law will preempt 'a state-

created right if that right may be abridged by an act which, in and of itself, would infringe one of

the exclusive rights' established by federal law.").  The Copyright Act provides:

> All legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by Section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title . . . . no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

*See* 17 U.S.C. § 301(a).  Thus, the Copyright Act specifically provides for preemption of state

law rights that (1) "come within the subject matter of copyright as specified by sections 102 and

103," and (2) "are equivalent to any of the exclusive rights within the general scope of copyright

as specified by § 106 in works of authorship that are fixed in a tangible medium of expression."

17 U.S.C. § 301(f)(1); *Ehat v. Tanner*, 780 F.2d 876, 878 (10th Cir. 1985).  Unless <u>both</u> of these

requirements are satisfied, the state law claim will <u>not</u> be preempted:

> (b) Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to-
>
>> (1) subject matter that does not come within the subject matter of copyright as specified by sections 102 and 103, including works of authorship not fixed in any tangible medium of expression; or
>> . . . .
>> (3) activities violating legal or equitable rights that are not equivalent to any of the  exclusive rights within the general scope of copyright as specified by section 106;

*See* 17 U.S.C. 301(b).

Moreover, the legislative history underlying the Copyright Act states unequivocally that

"[s]tate law causes of action such as those for misappropriation [and] unfair competition ... <u>are</u>

<u>not currently preempted</u> under § 301, and they will not be preempted under the proposed

[amendments to the Copyright Act]."  H. Rep. No. 101-514, at 21 (June 1, 1990) (emphasis

added).  Accordingly R. W. Beck's state law claims can only be preempted by § 301 if: (1) the

work is within the scope of the subject matter of copyright as specified in 17 U.S.C. 102 and

103; and (2) the rights granted under state law are equivalent to any exclusive rights within the

scope of federal copyright as set out in 17 U.S.C. § 106.

     **A.**     **R. W. Beck's Methodologies, Methods, Language and Associated Goodwill are not Copyrightable Subject Matter.**

     R. W. Beck's unfair competition and unjust enrichment claims are not based on E3's

copying the Reports as "works of authorship." Instead, R. W. Beck's unfair competition and

unjust enrichment claims rise from E3's unauthorized use of R. W. Beck's methodologies,

methods, language and associated goodwill, skills, labor and reputation in creating its reports.

*See* Compl. ¶ 8 ("R. W. Beck has developed analytical methodologies, methods, and language

for developing and communicating its findings, conclusions and recommendations in its Reports.

Those methodologies, methods, and language are original, proprietary, and unique to R. W.

Beck."); Gaines Decl. at ¶¶ 10-12 ("R. W. Beck carefully developed this language in

consultation with experts in the municipal financing industry, and reflected a unique approach to

these issues which differentiated R. W. Beck from its competitors"); *see also Chicago Board

Options Exch., Inc. v. Int'l Sec. Exch.*, No. 06-C-6852, 2007 WL 604984, at *5 (N.D. Ill. Feb. 23,

2007) (holding Copyright Act did not preempt state unfair competition claim for unauthorized

"use of plaintiffs' research and development used to create indexes" and associated goodwill,

reputation and necessary expenditures). Colorado law recognizes and protects R. W. Beck's

adherence to its standards, language and associated goodwill. *See Heller v. Lexton-Ancira Real

Estate Fund, Ltd.*, 809 P.2d 1016, 1021 (Colo. Ct. App. 1990), *rev'd on other grounds*, 826 P.2d

819 (Colo. 1992) (quoting *Int'l News Serv. v. Assoc. Press*, 248 U.S. 215 (1918) (finding

protectable material was acquired "as the result of organization and the expenditure of labor,

skill and money and which is saleable by [a plaintiff] for money")). Thus, R. W. Beck's

methodologies, methods, and language (as opposed to its written expression embodied in the

Copyrighted Works) are not copyrightable subject matter.

**B.      R. W. Beck's Rights under State Law Unfair Competition and Unjust Enrichment are not Equivalent to the Exclusive Rights in 17 U.S.C. § 106.**

R. W. Beck's rights under state unfair competition and unjust enrichment law are

separate from the exclusive rights granted to R. W. Beck under 17 U.S.C. § 106.  "The law of

unfair competition has its roots in the common-law tort of deceit." *Univ. of Colo. Found., Inc. v.*

*Am. Cyanamid*, 880 F. Supp. 1387, 1403 (D. Colo. 1995) (quoting *Bonito Boats, Inc. v. Thunder*

*Craft Boats, Inc.*, 489 U.S. 141, 157, (1989)).  A claim for "unfair competition" or

"misappropriation" under Colorado law occurs "when one either wrongfully profits from

another's expenditure of labor, skill, or money, or capitalizes wrongfully on commercial values

earned over a period of time."  *Heller*, 809 P.2d at 1021 (stating that torts of unfair competition

and misappropriation prohibit the appropriation of plaintiff's expenditure of labor, skill, and

money).  A claim for unjust enrichment requires a plaintiff to show that: (1) a benefit was

conferred on the defendant by the plaintiff, (2) the benefit was appreciated by the defendant, and

(3) the benefit was accepted by the defendant under such circumstances that it would be

inequitable for it to be retained without payment of its value. *Cablevision of Breckenridge, Inc. v.*

*Tannhauser Condo. Assoc.*, 649 P.2d 1093, 1096-1097 (Colo. 1982).  These rights are not

equivalent to the rights conferred by the Copyright Act.[7]

With regard to its unfair competition and unjust enrichment claims, R. W. Beck seeks

relief under these claims based not on E3's <u>reproduction</u> of the Copyrighted Works, but instead

on E3's <u>use</u> of R. W. Beck's methodologies, methods, language and associated goodwill, skills,

---

[7]  Section 106 of the Copyright Act grants to the copyright owner the exclusive rights to: (i)
reproduce the copyrighted work; (ii) prepare derivative works; (iii) distribute copies of the work;
(iv) perform the work publicly; and (v) display the work publicly. 17 U.S.C. § 106.

labor and reputation. *See* Compl. at ¶¶ 8, 26-28, 38. When competitors simply use the words used in R. W. Beck Reports, such use suggests to the reader that the R. W. Beck analyses as required by securities law and other legal requirements have been performed, up to R. W. Beck standards. Gaines Decl. at ¶ 12. Such use inappropriately trades off R. W. Beck's goodwill, which it has expended significant time, expense, and labor building. To the extent that E3 is not only copying the words from R. W. Beck's Copyrighted Works and is also using R. W. Beck's entire system of analyzing information to create such works, it is unlawfully using R. W. Beck's methodologies, methods, language, skills, labor, reputation, and goodwill. A "use" right is not one of the exclusive rights granted to R. W. Beck in 17 U.S.C. § 106, and accordingly, E3's use of R. W. Beck's methodologies, methods and language "does not fall within the scope of federal copyright law." *See Dow Jones & Co. v. Int'l Sec. Exch.*, 451 F.3d 295, 302 n.8 (2d Cir. 2006) (finding misappropriation claim based on defendants' use of plaintiff's research and development, goodwill, skills, labor and reputation fell outside of federal copyright law).

*Unfair Competition.* R. W. Beck has been in the business of preparing Independent Engineer's Reports in support of non-recourse project financing on solid waste to energy projects and electrical generation cogeneration projects since approximately 1985. *See* Marino Decl. at ¶ 6. Since this time, an integral part of its business has been building its goodwill among the industry. *Id.* at ¶ 5; Gaines Decl. at ¶ 12 ("R. W. Beck's strict adherence to these standards of quality, reasonableness, and impartiality is the foundation upon which the company has built its goodwill in the industry."). One manner in which R. W. Beck has built its goodwill is by educating its clients regarding its practices and providing comprehensive Independent Engineering Reports that reflect such standards. *Id.* Contrary to E3's suggestions, R. W. Beck's

reports are not "standard" for the industry, but rather are known for their accuracy and precision. *Id.*

As an employee with R. W. Beck from 1985-1997, Mr. Plath was trained in the methodologies, methods and practices of R. W. Beck. Marino Decl. at ¶ 25. As a project manager involved in preparing Independent Engineer's Reports, Mr. Plath had access to all R. W. Beck methods, methodologies, practices and previous reports. *Id.* In 1997, Mr. Plath departed from R. W. Beck and began working for E3. *See* Motion, Plath Decl., ¶ 10. In 2007, R. W. Beck discovered that E3 was using its methodologies, methods, and associated goodwill for at least E3's Windsor Project.[8] It is this use that threatens R. W. Beck's goodwill.

***Unjust Enrichment.*** By using R. W. Beck's methodologies, methods, and associated goodwill and expenditures in E3's Reports, a benefit was conferred from R. W. Beck to E3. *See* Gaines Decl. at ¶ 10 ("R. W. Beck has regularly updated its analytical methods, its practices for use and reliance on information provided by others" in its reports). E3 appreciated this benefit through using R. W. Beck's methodologies, methods, and associated goodwill and expenditures in soliciting customers. *See id.* at ¶ 12 ("When competitors simply use the words used in R. W. Beck Reports, such use suggests to the reader that the R. W. Beck analyses as required by securities law and other legal requirements have been performed, up to R. W. Beck standards."). Allowing E3 to use R. W. Beck's methods and associated goodwill and expenditures in creating and marketing E3's Reports are precisely the type of circumstances making it inequitable for E3 to retain this benefit without payment of its value.

---

[8] To date, E3 refuses to provide any discovery – indeed, even engage in a Rule 26(f) conference – to R. W. Beck so that R. W. Beck is unable to confirm suspicions that E3 uses R. W. Beck's methodologies, methods, practices, and goodwill on other projects.

Thus, R. W. Beck's methodologies, methods, language and associated goodwill are not copyrightable subject matter, and its state law unfair competition and unjust enrichment claims are not based on violations of the exclusive rights in 17 U.S.C. § 106.  As such, these claims are not preempted by the federal Copyright Act.  Moreover, genuine issues of material fact exist as to E3's use of R. W. Beck's methodologies, methods, language and associated goodwill, skills, labor and reputation in its reports, and summary judgment on these claims is unwarranted.

## IV.    Genuine Issues Of Material Fact Exist With Respect To R. W. Beck's CCPA Claim.

E3 argues that R. W. Beck's CCPA claim fails due to the absence of any significant public impact.  E3's argument is directed at only this element of the CCPA claim, "public impact"; accordingly, as an initial matter E3 concedes the existence of genuine issues of fact as to each of the remaining elements.[9]  Moreover, the premise of E3's argument fails as R. W. Beck alleged that "E3 Consulting's acts of deceptive trade practices have had and will continue to have a significant negative impact on the public, including but not limited to the deception of the actual and prospective consumers of R. W. Beck's consulting services."  Compl. ¶ 33.  As described below, genuine issues of material fact exist both as to the consuming public and the impact of E3's deceptive trade practices.

### A.    Elements Required to Prove a Claim Under the CCPA.

To succeed on its CCPA claim, R. W. Beck must prove that: (1) E3 engaged in an unfair or deceptive trade practice; (2) the challenged practice occurred in the course of E3's business, vocation, or occupation; (3) the practice significantly impacted the public as actual or potential

---

[9]  E3 additionally claims that R. W. Beck's CCPA claim must be "plead with particularity."  *See* Motion at 12.  However, what this Court has found is that the particularity requirement of Rule 9(b) "only requires identification of the circumstances constituting fraud. . . ." and the Complaint must allege sufficient facts to apprise defendants of the nature of the alleged deceptive trade practices.  *Duran v. Clover Club Foods Co.*, 616 F. Supp. 790, 793 (D. Colo. 1985).  R. W. Beck satisfies this standard.

consumers of E3's goods, services, or property; (4) R. W. Beck suffered injury in fact to a legally protected interest; and (5) the challenged practice caused R. W. Beck's injury. *Rhino Linings USA,  v. Rocky Mtn. Rhino Lining, Inc.*, 62 P.3d 142, 149 (Colo. 2003) (citing In *Hall v. Walker*, 969 P.2d 224 (Colo. 1998)).  The CCPA is construed liberally in light of the broad purpose and scope of the act. *Hall*, 969 P.2d at 230.

Under Colorado law, three factors are relevant in determining the existence of a "significant public impact": (1) the number of consumers directly affected by the challenged practice; (2) the relative sophistication and bargaining power of the consumers; and (3) evidence that the challenged practice has previously impacted other consumers or has significant potential to do so in the future. *See Rhino Linings*, 62 P.3d at 149.  This Court most recently applied this standard in *Ramirez v. eWork, Inc.*, No. 06-686, 2007 U.S. Dist. LEXIS 68893, at *11-13 (D. Colo. Sept. 18, 2007) (denying motion to dismiss CCPA claim).  In *Ramirez*, the court found plaintiff's allegations sufficient to state that eWork had engaged in a deceptive trade practice by inducing potential eWork "Affiliates" to register with eWork to receive projects that were copied from public advertisements. *Id*. at *11.  Turning to the "public impact" factor, the *Ramirez* court found that despite the fact that the Affiliates may have been sophisticated, eWork's practice of advertising business on the Internet had the potential to affect a large consuming public of potential Affiliates, and denied eWork's motion to dismiss that claim. *Id*. at *12-13.  Summary judgment is not appropriate in this case, as (1) a subset of the general public can be considered the "consuming" public for purposes of the CCPA, and (2) genuine issues of material fact exist whether E3's deceptive trade practices have a significant public impact.

**B.     A Subset Of The General Public Can Be Considered The "Consuming" Public For The Purposes Of The CCPA.**

This Court has often looked to the recipients of the deceptive trade practice to define who constitutes the "consuming" public for purposes of the CCPA.  *See*, *e.g.*, *Ramirez*, 2007 U.S. Dist. LEXIS, at *11-13 (potential eWork "Affiliates"); *Rhino Linings*, 62 P.3d at 150 (chemical products dealers); *Netquote, Inc. v. Byrd*, 504 F. Supp. 2d 1126, 1137 (D. Colo. 2007) (insurance companies paying MostChoice for insurance leads).  Here the consuming public consists of (1) the qualified institutional buyers of E3's Engineering Reports, and (2) the individual investors in those entities.

E3 claims that it issues its reports to "qualified institutional buyers" as defined in Rule 144A of the Securities Act of 1933.  *See* Motion at 2; Hurd Decl. ¶ 7.  E3 only tells half of the story.  While it is true that in some situations, "qualified institutional buyers" request consulting services when purchasing securities from energy companies, in many circumstances, the energy companies themselves commission consulting reports in an effort to raise money through sale of bonds.  *See* Gaines Decl. at ¶¶ 12, 22 ("Clients and the third party users of these reports are misled as to the actual process being used and the value and integrity of the analyses and opinions being provided.") (emphasis added).  Accordingly, the consuming public in this case consists of both (1) "qualified institutional buyers" and their individual investors, and (2) client energy companies seeking to raise capital through the sale of bonds.  E3's misleading use of R. W. Beck's methodologies, methods, and associated goodwill and expenditures in soliciting these customers has had and has the potential to have a significant impact.

R. W. Beck distributes its Reports to a wide array of clients and qualified institutional buyers, including corporations, partnerships, certain governmental and private registered dealers, registered investment companies, insurance companies, banks, savings and loan associations, and

others.  *See id.*  R. W. Beck and E3 are competitors in the same market, for the same services,

and compete for the same customers.  *See* Compl. at ¶¶ 8-9; Hurd Decl. ¶¶ 5-6.  Indeed,

"qualified institutional buyers" covers a vast array of entities, including corporations,

partnerships, certain governmental and private registered dealers, registered investment

companies, insurance companies, banks, savings and loan associations, and others.  *See* Rules

144A(d)(1)(i)-(iv); *see also* J. William Hicks, Resales of Restricted Securities, at 482-83

(Thomson West ed. 2007).  Accordingly, it is likely that E3's deceptive trade practices have a

significant public impact within the consuming public of "qualified institutional buyers."[10]

E3 relies on *Wedbush Morgan Sec., Inc. v. Kirkpatrick Pettis Capital Mgmt., Inc.*, No.

06-510, 2007 U.S. Dist. LEXIS 14390, at *23-25 (D. Colo. Feb 28, 2007) in an attempt to avoid

inclusion of individual investors in this analysis.  However, *Wedbush* is distinguishable.  The

deceptive trade practice at issue in *Wedbush*, a report, was distributed to one customer, and that

customer was a county which the *Wedbush* court found was separate from its residents.  *Id.*

Government entities and their residents are not at issue here.  Here, unlike in *Wedbush*, R. W.

Beck is aware of multiple instances in which E3 distributed its reports to customers, and

discovery is likely to reveal additional instances.

At a minimum, genuine issues of fact exist as to the existence of a significant public

impact.  E3 is not entitled to judgment as a matter of law on R. W. Beck's CCPA claim.

## CONCLUSION

For the reasons set forth herein, there exist genuine issues of material fact with respect to

each of four claims asserted by Plaintiff R. W. Beck, Inc. in its Complaint.  Accordingly, R. W.

---

[10] Given the wide range of potential "qualified institutional buyers" of E3's Engineering Reports, and given the fact that R. W. Beck has not had an opportunity to conduct discovery with respect to the level of sophistication of these buyers, it would be inappropriate at this point to grant summary judgment on this issue.

Beck respectfully requests that this Court deny the Motion for Summary Judgment filed by

Defendant E3 Consulting, LLC and direct the parties to proceed to discovery.

Dated: November 29, 2007.                    FAEGRE & BENSON LLP


s/ Natalie Hanlon-Leh
Natalie Hanlon-Leh
Mary V. Sooter
FAEGRE & BENSON LLP
3200 Wells Fargo Center
1700 Lincoln St.
Denver, CO 80203
303-607-3500
NHanlon-Leh@faegre.com
msooter@faegre.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 29, 2007, I electronically filed the foregoing **R. W. BECK'S OPPOSITION TO E3 CONSULTING'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF systems which will send notification of such filing to the following e-mail addresses:

Benjamin B. Lieb (blieb@sheridanross.com)
Scott R. Bialecki (sheridanross.com)
SHERIDAN ROSS, P.C.
1560 Broadway, Suite 1200
Denver, CO  80202-5141

s/ Debbi J. Camp

fb.us.2451996.01