IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-cv-1378-RPM

R. W. BECK, INC., a Washington corporation,

    Plaintiff,

v.

E3 CONSULTING, INC., a Colorado Limited Liability Company,

    Defendant.

## DECLARATION OF E. MICHAEL GAINES

I, E. Michael Gaines, hereby do state and affirm as follows:

1. I am over the age of 18. I have personal knowledge of the facts set forth below, and if called upon to do so, could and would competently testify thereto.

2. I earned a Bachelor's of Science in Electrical Engineering and a Masters of Science in Nuclear Engineering, am a registered engineer in four states, and have approximately 30 years of experience performing various consulting engineer services in support of the financing of electrical generation facilities.

3. I am a Senior Director of R. W. Beck, Inc. ("R. W. Beck"), a Washington corporation, with its principal offices at 1001 Fourth Avenue, Suite 2500, Seattle, WA 98154. I have been employed by R. W. Beck since 1975. In my capacity as Senior Director and Qualified Reviewer, I am familiar with the drafting of consulting reports and the training of employees of

R. W. Beck with respect to the practices and procedures required by R. W. Beck in drafting and issuing such reports.

4. R. W. Beck (and its predecessor-in-interest, R. W. Beck and Associates) has been a leading consultant providing consulting engineering services relating to the financing of utility facilities for over 60 years, and has been involved in the financing of more than 900 system and project financings of more than $135 billion. Its consulting services culminate into reports that are included in prospectuses that are issued for the financings.

5. To document the legal, risk management and professional practice issues which had been identified and addressed by it in the previous several decades based on its experience from serving as consulting engineer in the financing of municipal electrical facility projects, R. W. Beck created an internal training manual entitled "The Consulting Engineer's Role in the Preparation of Municipal Official Statement", dated September 1982 (the "Manual"). The Manual was a "living document" to be updated with new information as necessary. A true and accurate of copy of Volume 1 of the Manual is enclosed as Exhibit 10. The Manual included a copyright notice from 1982.

6. The Manual was proprietary to R. W. Beck, and the company used the Manual to train its engineers involved in municipal financing on the unique attributes and approaches used by R. W. Beck in rendering its consulting opinions and preparing its reports that reflect such opinions. The Manual sets forth guidelines for its employees to follow in both performing its consulting services and issuing its reports.

7. Chapter seven of the Manual specifically addresses the consulting engineer's report and contained a general discussion of the main items normally found in such a report.

Such items include an introduction and description of: (1) the agency issuing the bonds, *i.e.*, project participants; (2) the project to be financed; (4) the project financing; (5) the cost of power consisting of two basic elements – the estimate of cost of power from the project and a description of purchasers of power from the project and their business; (6) the sensitivity analysis; (7) the system financing; (8) the principal considerations and assumptions; and (9) the conclusions. *See* Ex. 10 at 15-25. This general format has been followed by R. W. Beck since at least the 1980's.

8. The Manual identified the importance discovered by R. W. Beck in collecting all of its principal assumptions and considerations in one location for the use by financial analysts who have come to rely on the format and issues addressed in R. W. Beck reports.

9. The Manual provided the following sample lead-in paragraph for use in R. W. Beck reports in the section addressing principal considerations and assumptions:

> In the preparation of this report and the opinions that follow, we have made certain assumptions with respect to conditions which may occur in the future. While we believe these assumptions are reasonable for the purpose of this report, they are dependent upon future events and actual conditions may differ from those assumed. In addition, we have used and relied upon certain information provided to us by others. While we believe the sources to be reliable, we have not independently verified the information and offer no assurances with respect thereto. To the extent that actual future conditions differ from those assumed herein or provided to us by others, the actual results will vary from those forecast.
> …

*See id.* at 24.

10. R. W. Beck carefully developed this language in consultation with experts in the municipal financing industry, and reflected a unique approach to these issues which differentiated R. W. Beck from its competitors. These Reports require the application of sophisticated engineering and technical analysis of complex facilities in a report which must be

prepared with consideration for the potential securities law, third party reliance issues, accuracy of forecasts, disclosure of limitations and disclaimers and similar legal liabilities of the Consulting Engineer and its client. Since R. W. Beck began preparation of its Reports in the 1940s, R. W. Beck has regularly updated its analytical methods, its practices for use and reliance on information provided by others, updated its documentation methods in its Reports and updated its Report format and content to continually address changing legal concepts and risk issues inherent in preparing Reports for the financing of large, complex projects and facilities.

11. For example, the Mayben memo of June 8, 1987 summarizes R. W. Beck's analysis of new securities law and third-party reliance developments in the use of information and projections provided by others in its reports. This memorandum requires the use of additional tests and reviews to evaluate the reasonableness of the use of such information for purposes of the Report. The procedures used are also required to be documented in the file, for the benefit of the Client and the Consulting Engineer in the event the basis for use of the information or projections is ever questioned. The memorandum then describes specific language to be incorporated in all reports which confirms that the Consulting Engineer has a reasonable basis for the use of such information. This entire system of analyzing information in the context of applicable securities law and other legal requirements, documenting the necessary analysis and preparing report language that clearly represents what the Consulting Engineer has done and what a user may reasonably rely upon goes to the heart of why Consulting Engineer or Independent Engineer Reports are prepared for clients.

12. R. W. Beck's strict adherence to these standards of quality, reasonableness, and impartiality is the foundation upon which the company has built its goodwill in the industry. R.

W. Beck educates its clients to understand the various analyses that support its engineering reports, and the report is not simply a reflection of the services provided, but is part of the services itself. When competitors simply use the words used in R. W. Beck Reports, such use suggests to the reader that the R. W. Beck analyses as required by securities law and other legal requirements have been performed, up to R. W. Beck standards. Clients and the third party users of these reports are misled as to the actual process being used and the value and integrity of the analyses and opinions being provided.

13. The policies and procedures of R. W. Beck prohibit the release of any engineering report without the review and approval of the partner in an office or region charged with such responsibility. *See id.* at 2. In addition, deviations from the standard language provided in the 1982 Manual had to be approved by a management-level partner in the financing practice.

14. The language used by Black & Veatch in its Independent Engineer's Report on the Carson Ice-Gen Project dated July 29, 1993 is almost identical to that used in the 1982 Manual:

| **1982 Manual** | **July 29, 1993 Black & Veatch Report** |
|---|---|
| *In the preparation of this report and the opinions that follow, we have made certain assumptions with respect to conditions which may occur in the future. While we believe these assumptions are reasonable for the purpose of this report*, they are dependent upon future events and actual conditions may differ from those assumed. In addition, *we have used and relied upon certain information provided to us by others*. While we believe the sources to be reliable, we have not independently verified the information and offer no assurances with respect thereto. *To the extent that actual future conditions differ from those assumed herein or* | *Black & Veatch has used and relied upon certain information provided by the Owner, the Developer, SMUD, and others* in this assessment of the Project. *We believe the information* provided is true and correct, and *reasonable for the purposes of this Report. In preparing this Report and the opinions presented herein, Black & Veatch has made certain assumptions with respect to conditions which may exist, or events which may occur in the future. We believe that the use of this information and assumptions is reasonable for purpose of this Report.* However, some events may occur or circumstances change, which |

5

| | |
|---|---|
| *provided to us by others, the actual results will vary from those forecast. ...* | cannot be foreseen or controlled by Black & Veatch, and which may render our assumptions incorrect. *To the extent that actual future conditions differ from those assumed herein or provided to Black & Veatch by others, the actual results vary from those which have been forecast* in this Report. *This Report summarizes Black & Veatch's assessment of the Project as of the date of this Report.* |

*Compare* Ex. 10 at 16 *with* Plath Decl., Ex. A, at 2.

15.     Later, the standard language used by R. W. Beck in its engineering reports was incorporated into the Standards of the Practice ("SOP"). A true and correct copy of the R. W. Beck SOP is attached as Exhibit 11. The SOP was originally issued on June 29, 1994, and the sections relating to use of standard language in R. W. Beck reports and the format of such reports were updated in 1997. *See* Ex. 11 at §§ VI, VII.

16.     The SOP directs that certain preferred standard language be used in certain portions of the engineering reports issued by R. W. Beck. *See id.* at § VI-1. The SOP memorialized R. W. Beck's policy and procedure that had been in place since the mid-1980's that deviations from the standard language had to be approved by R. W. Beck. *See id.*

17.     The SOP provides standard introductory language for sensitivity analyses, which are an integral part of every R. W. Beck engineering report:

> Due to uncertainties necessarily inherent in relying on assumptions and projections, it should be anticipated that certain circumstances and events may differ from those assumed and described herein and that such will affect the results of the Base Case Analyses. In order to demonstrate the impact of certain circumstances on the Base Case, certain sensitivity analyses were developed. It should be noted that other examples could have been considered, and those given here are not intended to reflect the full extent of possible changes. The sensitivities are not presented in any particular order with regard to the likelihood of any case actually occurring. In addition, no assurance can be given that all relevant sensitivities have been presented, that the level of each sensitivity is the

appropriate level for testing purposes, or that only one (rather than a combination of more than one) of such variations or sensitivities could impact the Project or the System in the future.

See id. at § VI-4.

18. The SOP also sets forth the following introduction for the section entitled Principal Assumptions and Considerations:

> In the preparation of this Report and the opinions presented in this Report, we have made certain assumptions with respect to conditions which may exist or events which may occur in the future. While we believe these assumptions to be reasonable for the purpose of this Report, they are dependent upon future events, and actual conditions may differ from those assumed. ... While we believe the use of such information and assumptions to be reasonable for the purposes of this Report, we offer no other assurances with respect thereto, and some assumptions may vary significantly due to unanticipated events and circumstances. To the extent that actual future conditions differ from those assumed herein or provided to us by others, the actual results will vary from those projected herein. This Report summarizes our work up to the date of the Report. Thus, changed conditions occurring or becoming known after such date could affect the material presented to the extent of such changes.

See id. at § VI-4-5.

19. With respect to the various assumptions to be included in the Principal Assumptions and Considerations section, the SOP directs that one of the assumptions should deal with the validity and enforceability of contracts, and should read as follows:

> As Independent Engineer, we have made no determination as to the validity and enforceability of any contract, agreement, rule or regulation applicable to the System and its operations. However, for the purposes of this Report, we have assumed that all such contracts, agreements, rules, and regulations will be fully enforceable in accordance with their terms, as we understand them.

See id. at § VI-6.

20. The SOP also sets guidelines for the format of R. W. Beck reports:

> The Conclusions should be the last section of the Report, before the exhibits. We believe that it is important for the reader of our Report to understand the results of our analyses and the underlying assumptions before reading the conclusions.
>
> The section on "Principal Assumptions and Considerations" should appear immediately prior to the Conclusions.

*See id.* at § VII-2.

21. The Manual and SOP reflect the practices, methodologies, and language used by R. W. Beck in its consulting business. For example, both the Manual and SOP emphasize that R. W. Beck's approach to its role in assisting clients in financing efforts is one of independence and objectivity. *See* Ex. 10 at 2; Ex. 11 at II-2-3. R. W. Beck also emphasizes that it does not differentiate between various readers of its reports being small or large investors, so the SOP should be applied regardless of the use of the report. *See* Ex. 11 at II-4. Both of these practices are in turn reflected in the reports generated by R. W. Beck, which are required to be balanced and comprehensive; give proper weight to both the positive and negative facts; must disclose any engineering facts or considerations which may have a negative effect on the project; and must not provide any authority regarding financial or legal matters. *See* Ex. 10 at 2; Ex. 11 at II-2-3.

22. Because R. W. Beck's methodologies and reports differ in many respects from the reports of its competitors, and the format and language of its reports reflect the distinctiveness of practice, R. W. Beck requires that any significant variations from the approved format requires the approval of the Managing Director of Consulting Services. *See* Ex. 11 at VII-1.

23. To my knowledge, at no time was Paul B. Plath the Managing Director of Consulting Services for R. W. Beck and therefore, Mr. Plath did not have the authority to diverge from either the standard language or format of the engineering reports during his tenure at R. W. Beck between 1985-1997.

9

I hereby affirm and declare under penalty of perjury that the foregoing is true and correct to the best of my recollection, knowledge and ability.

Dated this 29th day of November, 2007.

/s/ E. Michael Gaines
E. Michael Gaines