IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-cv-01378-RPM

R.W. BECK, INC., a Colorado Corporation,

    Plaintiff,

v.

E3 CONSULTING, LLC, a Colorado limited liability company,

    Defendant.

---

ORDER GRANTING SUMMARY JUDGMENT

---

    R.W. Beck, Inc. ("Beck"), an engineering and management consulting firm, provides services to utilities, financial institutions, and governmental entities. Defendant E3 Consulting, LLC ("E3") is a competitor in the same business. Both companies prepare independent engineer's reports of their analyses and opinions to support the financing of infrastructure projects. At issue in this case are two of the plaintiff's copyrighted reports, claimed to have been infringed by E3 reports.

    Four exhibits are attached to the complaint: (1) copyright certificate number TX 5-093-728, effective November 3, 1999, for a Beck report, identified as "Independent Engineer's Report, Orange Cogeneration Limited Partnership Project" ("Orange Report"); (2) copyright certificate TX 4-254-058, effective April 1, 1996, for a Beck report, identified as "Independent Engineer's Report, Sacramento Power Authority Cogeneration Project" ("Sacramento Report");

(3) a three-page excerpt from the Orange Report, and (4) a three-page excerpt from an E3 report known as the Windsor Report.

Beck alleges comparing the excerpt from its Orange Report (Ex. 3) and the excerpt from the defendant's Windsor report (Ex. 4) shows that "significant portions of E3 Consulting's reports are copies of significant portions of R.W. Beck's original works." (Compl. ¶ 15). Invoking jurisdiction provided by 28 U.S.C. § 1331, Beck asserts willful copyright infringement in violation of 17 U.S.C. § 101, et seq.; and supplemental jurisdiction under § 1367 for three claims under Colorado law: (1) unfair competition; (2) deceptive trade practices in violation of the Colorado Consumer Protection Act , Colo. Rev. Stat. § 6-1-101, et seq. ("CCPA"), and (3) unjust enrichment.

On August 22, 2007, the defendant moved to dismiss all four claims. Because the defendant supported its motion with two declarations and seven exhibits attached to those declarations, the motion was converted to a motion for summary judgment by order of August 23, 2007. The plaintiff moved pursuant to Rule 56(f) to deny the defendant's motion or hold it in abeyance pending discovery. That motion was denied by order of November 9, 2007.

To establish a claim of copyright infringement, the plaintiff must show that it possesses a valid copyright and that the defendant copied protectable elements of the copyrighted work. *Country Kids 'N City Slicks, Inc. v. Sheen*, 77 F.3d 1280, 1284 (10th Cir 1996). "[A] plaintiff may prove defendant's copying either by direct evidence or, as is most often the case, by showing that (1) the defendant had access to the plaintiff's copyrighted work, and (2) defendant's work is substantially similar to the plaintiff's copyrightable material." *Autoskill Inc. v. Nat'l*

*Educ. Support*, 994 F.2d 1476, 1489 (10th Cir. 1993)(quoting *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 701 (2d Cir.1992)).

Both Beck's Orange Report and E3's Windsor report contain a section entitled "Principal Considerations and Assumptions Used in the Projection of Operating Results," and both follow it with "Conclusions." Beck claims that its former employees who now work for E3 copied these portions of the Beck reports as shown by the substantial similarity of language.

Assuming the validity of Beck's copyrights, E3 denies that the specific portions of Beck's Sacramento and Orange Reports alleged to have been copied are protectable elements of those works.

To determine whether there has been copying of protectable elements of a copyrighted work, the United States Court of Appeals for the Tenth Circuit has directed use of an "abstract-filtration-comparison" test. In *Country Kids*, the court explained:

> At the abstraction step, we separate the ideas (and basic utilitarian functions), which are not protectable, from the particular expression of the work. Then, we filter out the nonprotectable components of the product from the original expression. Finally, we compare the remaining protected elements to the allegedly copied work to determine if the two works are substantially similar.

*Country Kids*, 77 F.3d at 1284-85.

Citing similar language in a July 29, 1993 report prepared by the engineering firm Black & Veatch (the "Black & Veatch Report"), the defendant's Senior Vice President, Paul Plath, in his declaration asserts that the Black & Veatch Report was the source of the relevant language in the plaintiff's Sacramento and Orange Reports. Saying that he worked for Beck from 1985-1997 and was the primary author of the Sacramento Report, Plath explained that in 1994, the Sacramento Municipal Utility District (SMUD) selected Beck to be the independent engineer for

-3-

two special entities, the Sacramento Power Authority and the Sacramento Cogeneration Authority.  They were formed to finance and build two electric power plants.  Goldman Sachs & Company served as the lead investment bank for the Sacramento projects.  Beck ultimately prepared two reports for the Sacramento projects.  One is the subject of copyright certificate TX 4-254-058, attached as Exhibit 2 to the complaint.  (Plath decl. ¶¶ 5-9).

Plath said that at a meeting in July or August 1994, a representative of Goldman Sachs gave Plath a copy of the Black & Veatch Report with a request that Beck follow that format in its Sacramento Reports.  According to Plath, the Black & Veatch Report was used as a template for the Sacramento Report.  (Plath decl. ¶¶ 7-8).

Plath said that he was one of the principal authors of Beck's Orange Report, prepared for CS First Boston in connection with the Orange Cogeneration Limited Partnership Project located near Barstow, Florida.  (Plath decl. ¶ 10).  According to Plath, an electronic version of one of the Sacramento Reports was used as a template for the Orange Report, although Plath left Beck in 1997, before the report was completed.

Attached as Exhibit C to the Plath declaration are the same three pages of the Orange Report that are Exhibit 3 to the complaint.  Plath highlighted the language in Exhibit C which he says was adopted from the Black & Veatch Report.  Comparing the remaining language of the Orange Report after this filtration to the pages of E3's Windsor Report attached as Exhibit 4 to the Complaint, and highlighting those words found in both the Windsor Report and the Orange Report, Plath states this comparison shows identity with respect to only 130 words out of approximately 1500.  (Plath decl. ¶ 11-12).

Relying on Plath's declaration, E3 contends that the plaintiff's claim of copyright infringement must be dismissed because the language claimed to have been copied is not protectable because it was not original to the Orange and Sacramento Reports and any similarities remaining after filtration are too insignificant to support a claim of infringement.

The plaintiff acknowledges that the abstraction-filtration-comparison test is applicable to the determination of substantial similarity, but argues that the Black & Veatch Report is an improper basis for abstraction and filtration because Beck used the subject language before it appeared in the Black & Veatch Report. To support this contention, the plaintiff submitted the declarations of its employees, Kenneth Marino and Michael Gaines, with twelve exhibits.

According to Gaines, Beck created an internal training manual entitled "The Consulting Engineer's Role in the Preparation of Municipal Official Statement" in 1982. (Gaines decl. ¶ 5 & Ex. 10 (the "Manual")). The Manual was proprietary to Beck and included a copyright notice from September 1982. The Manual addresses matters of legal, risk management and professional practices applicable to a consulting engineer's role in the financing of municipal electrical facility projects. (Gaines decl. ¶¶ 5, 6). In Chapter 7, the Manual describes the main items normally found in a consulting engineer's report, including a sample lead-in paragraph for the section regarding "principal considerations and assumptions." Gaines' declaration states, "R.W. Beck carefully developed this language in consultation with experts in the municipal financing industry . . . . These reports require the application of sophisticated engineering and technical analysis of complex facilities in a report which must be prepared in consideration for the potential securities law, third party reliance issues, accuracy of forecasts, disclosure of

limitations and disclaimers and similar legal liabilities of the Consulting Engineer and its client."
(Gaines Decl. ¶ 10).

In his declaration, Marino explains that an important section in all engineering reports in support of financing is a section discussing "sensitivity analyses." Sensitivity analyses demonstrate the impact that different assumptions or future conditions would have on the opinions and analyses of the report. According to Marino, Beck has included an original standard sensitivity section in all of its consulting engineers reports since 1985. (Marino decl. ¶¶ 6, 8-9). Marino's declaration describes the importance of a "reliance and risk management section," included in reports under the heading "Principal Considerations and Assumptions." Marino states that each of Beck's engineering reports from 1985 through 1995 included a "Considerations and Assumptions" statement, original to Beck, which was revised in 1987, because of developments in securities law. (Marino decl. ¶¶ 10, 14).

Excerpts from four Beck reports were attached to Marino's declaration: the SES Claremont Report, dated July 24, 1985 (Ex. 6); the Chicopee Report, dated August 21, 1985 (Ex. 7), the Alexandria Report, dated September 18, 1986 (Ex. 8), and the Delaware Report, dated January 7, 1992 (Ex. 5). These excerpts are submitted to show that the relevant portions of the Sacramento and Orange Reports did not originate from the Black & Veatch Report.

Gaines reported that Beck issued a document entitled "Standards of Practice" in 1994. (Ex. 11, "the SOP"). It incorporated the standard language which Beck had been using in its reports and directed that certain preferred standard language be used in certain portions of Beck's engineering reports. (Gaines decl. ¶¶ 15-20).

In short, the plaintiff's position is that the original sources for the relevant language in Beck's Sacramento and Orange Reports are the SES Claremont, Alexandria, Chicopee and Delaware Reports (along with the 1982 Manual) and Beck's SOP.  (Pl.'s opp'n br. at 4).  The plaintiff's opposition brief also advances a theory of copyright infringement that is not articulated in the complaint.  The plaintiff contends that the format of its reports (i.e., the arrangement and sequence of the various sections) is copyright protected, and that the defendant has infringed its copyright by using the same format.  The plaintiff argues that it has demonstrated that there are genuine issues of material fact, making summary judgment inappropriate.

The defendant points out that the plaintiff has acknowledged that the relevant language in the Sacramento and Orange Reports is not original to those reports.  Applying the filtration to those earlier texts, the result is the same as using the Black & Veatch Report for comparison.  That is, after unoriginal text is filtered from the plaintiff's Orange and Sacramento Reports, any similarities between the remaining text and the Windsor Report are *de minimis*.

E3 argues that as a matter of law, the plaintiff's copyrights for the Sacramento and Orange Reports do not extend to those portions copied from pre-existing materials.

The defendant argues that the plaintiff's claim fails because the plaintiff has not shown that its earlier works (i.e., the SES Claremont Report, the Chicopee Report, and the Alexandria Report) are subject to copyright protection, saying that any material dated earlier than February 28, 1989, which lacks a copyright notice and was not registered with the Copyright Office has passed into the public domain.

The defendant argues that the format of Beck's works is not subject to copyright protection because there are only a limited number of ways that these qualifiers and limitations can be expressed.

The determinative question raised by the defendant is whether the language alleged to be copied constitutes protected elements of the Sacramento and Orange Reports. Factual disputes about the degree of similarity between the plaintiff's and the defendant's reports are immaterial if the expression alleged to be copied is not protected. Utilitarian statements disclaiming liability, qualifying assumptions, or identifying risk factors in a consulting engineer's report are not protected by copyright.

Beck has acknowledged that the relevant portions of the Sacramento and Orange Reports are not original to those reports. The plaintiff also acknowledges that the abstraction-filtration-comparison test applies and that unoriginal content must be filtered from the subject works. The essence of copyright is originality. To show that the copyright extends to the language in question, the plaintiff must show that it is original to the copyrighted reports. It has not.

The plaintiff's evidence showing the history of Beck's use of the subject language, dating back to the 1980s does not make that showing. Beck is not suing for infringement of the 1982 Manual, its SES Claremont Report, the Chicopee Report, the Alexandria Report, the Delaware Report, or the 1994 SOP. Gaines' declaration states, "R.W. Beck carefully developed this language in consultation with experts in the municipal financing industry." This statement does not identify who authored the language in question. That is information known to the plaintiff

and does not require discovery. The plaintiff's evidence is not sufficient to support its claim of authorship of the subject language.

The Copyright Act defines a "derivative work" as follows:

A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work".

17 U.S.C. § 101. To constitute a "derivative work," the work must have been "substantially copied" from the prior work. *Mulcahy v. Cheetah Learning, LLC*, 386 F.3d 849, 853 (8th Cir. 2004). This standard is similar to the test for infringement. *Id.* If the plaintiff's Sacramento and Orange Reports are derivative works, then the plaintiff loses because the copyright for those works "is limited to the features that the derivative work adds to the original." *Id.* at 852. If the plaintiff's Sacramento and Orange Reports are not derivative works because they are not substantially similar to the plaintiff's earlier reports, then the similarities between the plaintiff's Sacramento and Orange Reports and the Windsor Reports are not substantial enough to show infringement.

The subject language had passed into the public domain. 17 U.S.C. § 405(a)(2) provides:

(a) Effect of Omission on Copyright.--With respect to copies and phonorecords publicly distributed by authority of the copyright owner before the effective date of the Berne Convention Implementation Act of 1988, the omission of the copyright notice described in sections 401 through 403 from copies or phonorecords publicly distributed by authority of the copyright owner does not invalidate the copyright in a work if–

\* \* \*

(2) registration for the work has been made before or is made within five years after the publication without notice, and a reasonable effort is made to add notice to all

> copies or phonorecords that are distributed to the public in the United States after the omission has been discovered.

Thus, any material predating February 28, 1989, lacking a copyright notice and not registered with the Copyright Office within five years of its publication is deemed dedicated to the public. The plaintiff has not denied that these earlier reports were given to those having an interest in the projects for which they were written. That constitutes publication.

In short, the plaintiff has failed to show sufficient evidentiary support to proceed to trial on its claim of copyright infringement.

Beck's claim of unfair competition is summarized as follows:

> When competitors simply use the words used in R. W. Beck Reports, such use suggests to the reader that the R. W. Beck analyses as required by securities law and other legal requirements have been performed, up to R. W. Beck standards. . . . Such use inappropriately trades off R. W. Beck's goodwill, which it has expended significant time, expense, and labor building. To the extent that E3 is not only copying the words from R. W. Beck's Copyrighted Works and is also using R. W. Beck's entire system of analyzing information to create such works, it is unlawfully using R. W. Beck's methodologies, methods, language, skills, labor, reputation, and goodwill.

(Pl.'s opp'n br. at 21).

To the extent that the plaintiff's claim of unfair competition arises out of the defendant's allegedly improper use of language found in the plaintiff's copyrighted works, it falls within the subject matter and general scope of federal copyright law and is preempted. 17 U.S.C. § 301(a).

Because copyright law does not protect methods, the plaintiff's broader claim, that it is injured by the defendant's use of Beck's analytical methods, is not preempted. The claim fails because the plaintiff has not shown any factual basis for it. In *NetQuote, Inc. v. Byrd*, 504 F.Supp.2d 1126 (D. Colo. 2007), Judge Ebel reviewed the Colorado cases addressing unfair competition and summarized that law as follows:

> Thus, state and federal courts applying Colorado law have consistently held that the tort of unfair competition requires, first, that the defendant has copied the plaintiff's products or services or misappropriated plaintiff's name or operations in some regard, and second, that this conduct is likely to deceive or confuse the public because of the difficulties in distinguishing between the plaintiff's and defendant's products and services.

*Id.* at 1131. Here, the plaintiff's allegations of unfair competition are merely conclusory. The plaintiff has not pleaded any specific facts and has not come forth with any evidence showing public confusion. The plaintiff has not has produced any evidence showing that E3 represents its materials as those of Beck. The plaintiff has not identified any consumers or potential consumers of the subject services and reports who are confused or deceived about them. These deficiencies are fatal to the plaintiff's claim of unfair competition under Colorado law.

In its third claim for relief, the plaintiff alleges that E3 has knowingly passed off text from Beck's proprietary and copyrighted reports as those of E3 and knowingly made false representations about the source of its reports. The plaintiff alleges that these acts constitute deceptive trade practices having a significant public impact, in violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-105.

To prove its claim under the CCPA, the plaintiff must show: "(1) that the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation; (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) that the plaintiff suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury." *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146-47 (Colo. 2003).

The defendant seeks dismissal of this claim, arguing that the plaintiff has neither pleaded nor shown factual support of significant public impact. Factors relevant to the determination of whether a challenged practice significantly impacts the public within the context of the CCPA include "(1) the number of consumers directly affected by the challenged practice, (2) the relative sophistication and bargaining power of the consumers affected by the challenged practice; and (3) evidence that the challenged practice has previously impacted other consumers or has the significant potential to do so in the future." *Rhino Linings*, 62 P.3d at 149.

In his declaration, the President and Chief Executive Officer of E3, Donald J. Hurd, informs that E3 prepared the Windsor Report at the request of a lender, Calyon Corporate, as part of technical due diligence in connection with financing sought for two coal-fired cogeneration plants owned by Windsor Financing, LLC. Windsor Financing was a special-purpose limited liability company owned by Cogentrix Energy ("Cogentrix"), a subsidiary of the Goldman Sachs Group, Inc., and was organized to facilitate the private offering of bonds. (Hurd decl. ¶ 7). Hurd states that the Windsor Report was requested by the lender (Calyon), paid for by the borrower, and was not distributed in any offering to the public, rather it was included as an appendix to a Rule 144A Offering Circular to "qualified institutional buyers." (*Id*. ¶¶ 8-9). Hurd states that qualified institutional buyers are sophisticated institutional investors, such as pension or mutual funds with $100M under management or broker-dealers with at least $10M portfolios. (*Id.* ¶ 7). According to Hurd, E3's reports are not issued to individual members of the consumer public, but only to investment banks and/or commercial lenders, and E3's services are not offered to the general consuming public. (*Id*. ¶ 10).

The defendant argues that these facts show that the Windsor Report had no significant impact on the public-at-large, and thus the plaintiff cannot prove an essential element of its claim under the CCPA.

The plaintiff counters by defining the consuming public as "qualified institutional buyers" and client energy companies seeking to raise capital through the sale of bonds, arguing that this subset of the general public can be considered the "consuming public" for the purposes of the CCPA. The plaintiff points out that "qualified institutional buyers" include a variety of entities, including corporations, partnerships, certain governmental and private registered dealers, registered investment companies, banks, saving and loan associations, and others. The plaintiff states "it is likely that E3's deceptive trade practices have a significant impact within the consuming public of qualified institutional buyers." (Pl.'s opp'n br. at 26).

The legal arguments advanced by the plaintiff are without merit. *Ramirez v. eWork*, *Inc.*, 2007 WL 2746634, Civil Action No. 06-CV-00686 (D. Colo. Sept. 18, 2007), cited by the plaintiff, provides no support for the plaintiff's position. The facts of *Ramirez* bear no resemblance to this one. The purposes of the CCPA (to deter and punish deceptive trade practices against the public) are not implicated here. The plaintiff's CCPA claim is without legal or factual support.

Claiming unjust enrichment, Beck alleges that E3 has benefitted from its unauthorized use of Beck's copyrighted works at the expense of Beck, and as a result of Beck's consulting work for its own clients.

To the extent that the plaintiff's claim of unjust enrichment arises out of the defendant's allegedly improper use of language found in the plaintiff's copyrighted works, the claim falls

within the subject matter and general scope of federal copyright law and is preempted.  To the extent that the claim relates to the defendant's use of particular methodologies, it fails because Beck has not pleaded sufficient facts nor provided evidence to support its conclusory statement that E3 has improperly obtained a benefit from the plaintiff.

All of the plaintiff's claims appear to be based on an annoyance with Plath who learned Beck's methods and practices, and then departed to E3.  The plaintiff does not allege that Plath or any other E3 employee is violating a covenant not to compete or violating a trade secrets agreement or any other agreement that would protect the plaintiff's methods.  The plaintiff simply complains that E3 is damaging the plaintiff's goodwill by using its methods.  Notably, the plaintiff does not cite any legal authority in support of this theory of unjust enrichment.  This claim is without merit.

Upon the foregoing, it is

ORDERED, that the defendant's motion for summary judgment [doc. 8] is granted.  The clerk shall enter a final judgment dismissing all of the plaintiff's claims and this civil action with an award of defendant's costs.

Dated:  August 19, 2008

BY THE COURT:

s/Richard P. Matsch

_____
Richard P. Matsch, Senior District Judge